### The PEOPLE of the State of Colorado, Complainant,

v.

### Norman B. BEECHER, Respondent.

### No. 07PDJ081.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Feb. 3, 2009.

## OPINION AND ORDER IMPOSING SANCTIONS

On December 2–4, 2008, a Hearing Board composed of Gail C. Harriss, and Henry R. Reeve, both members of the Bar, and William R. Lucero, the Presiding Disciplinary Judge ("the Court"), held a hearing pursuant to C.R.C.P. 251.18. James S. Sudler appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). Norman B. Beecher ("Respondent") appeared *pro se*. The Hearing Board now issues the following "Opinion and Order Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

## I.  *ISSUE*

A lawyer violates the Colorado Rules of Professional Conduct if he represents a client with whom a conflict exists or uses tactics in the representation of the client that serve no purpose other than to harass witnesses. Respondent was disqualified from representation after he carried on an intimate relationship with his client, conducted depositions of witnesses that served no substantial legal purpose, and created unnecessary animus amongst the parties. What is the appropriate sanction, if any?

## II.  *SUMMARY*

The clear and convincing evidence shows that Respondent was negligent in failing to heed a substantial risk that his intimate, albeit non-sexual, relationship with his client created a conflict in representing her interests in a divorce where the legal issues involved division of property and maintenance, but not marital fault.[1] Respondent's client wanted to use depositions to demonstrate her husband's alleged misconduct during the marriage. The client's misguided strategy prevailed when Respondent adopted it. By following his client's plan, Respondent failed to exercise professional and independent judgment on behalf of his client.

Instead of litigating the legal issues of marital property and maintenance, Respondent knowingly agreed with his client to de-

pose her husband and the parties' adult son about the husband's alleged sexual misconduct during the course of their twenty-four year marriage, including an alleged sexual conduct involving a minor daughter.

After carefully considering all of the evidence, the Hearing Board concludes by clear and convincing evidence that Respondent violated the following rules:

- Colo. RPC 4.4 (Claims One and Two, in representing a client, a lawyer shall not use means that have no *substantial* purpose other than to embarrass, delay, or burden a third person) (emphasis added).
- Colo. RPC 1.7(b) (Claim Four, a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests).
- Colo. RPC 8.4(d) (Claim Five, it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice).

While a public censure is generally appropriate when a lawyer *negligently* violates Colo. RPC 1.7 (conflict rule) we find that a stricter sanction is appropriate when, as here, Respondent knowingly violates Colo. RPC 4.4 by engaging in tactics that serve no substantial purpose other than to harass witnesses. We therefore impose the following sanction:

**SANCTION IMPOSED: ATTORNEY SUSPENDED FOR ONE YEAR AND ONE DAY, ALL BUT NINETY (90) DAYS STAYED UPON THE SUCCESSFUL COMPLETION OF A TWO–YEAR PERIOD OF PROBATION WITH THE CONDITION OF ETHICS SCHOOL.**

## III.  *FINDINGS OF MATERIAL FACT*

On December 18, 2007, the People filed their Complaint and Respondent filed his Answer on February 11, 2008. On February 26, 2008, the Court held an At–Issue Conference and scheduled the matter for hearing to

---

1. *See* ABA *Standards,* Definitions. Negligence is the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will

follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.

be held on December 2–4, 2008. At the hearing, the Hearing Board considered the testimony of each witness and exhibits admitted into evidence, and now makes the following findings of material fact by clear and convincing evidence.

Respondent took and subscribed the Oath of Admission and gained admission to the Bar of the Colorado Supreme Court on May 25, 1983. He is registered upon the official records of the Colorado Supreme Court, Attorney Registration No. 12722. Respondent is therefore subject to the jurisdiction of the Hearing Board in these disciplinary proceedings pursuant to C.R.C.P. 251.1(b).

### Background

Respondent is a 50–year–old lawyer who has been engaged in the solo practice of law since 2005. Overall, he has practiced for nearly twenty years in Colorado. During this time, he served as an Assistant City Attorney in Aurora for nine years and later worked for a private firm. Respondent estimates that he now spends up to 20% of his time on domestic cases. He also practices transactional, immigration, and general litigation law. Respondent presently maintains a law office in his residence.

In June 2006, while representing his former wife in a dissolution of marriage proceeding, Respondent met Mrs. E at a party. At that time, Mrs. E had been married to her husband, Mr. E, for twenty-four years. Mrs. E and her husband had raised two children, who at the time of the divorce proceedings were young adults living outside the family home. In 2006, the couple lived apart while Mr. E worked outside the state of Colorado.

While living apart, Mr. E worked as a general manager in the car dealership business in South Carolina. Mrs. E lived in Colorado and did not work outside the home.

She cared for two of her grandchildren from a previous marriage and she had not worked outside the home in a number of years. Sometime during October 2006, after meeting Respondent, Mrs. E asked Respondent if he would represent her in a dissolution of marriage proceeding against her husband. Respondent agreed to represent her on a *pro bono* basis.

At the time Mrs. E filed her original dissolution of marriage petition, she had alleged that the marriage was "irretrievably broken." [2] Although Mr. E initially answered the petition and alleged that the marriage was *not* irretrievably broken, he later agreed (through his attorney during his deposition) that the marriage was irretrievably broken. The parties stipulated in these proceedings that the primary legal issues in the dissolution of marriage proceedings concerned the division of property and maintenance.[3]

Sometime after Respondent commenced his representation of Mrs. E, the parties' adult son discovered Respondent's laptop computer in his mother's bedroom. The laptop computer contained pictures of his mother and Respondent in Belize, a trip they took over the Thanksgiving holiday. The adult son also noticed Respondent's car parked in the garage of the family residence. The parties' adult daughter too noted Mrs. E's relationship with Respondent and expressed concern.[4]

Respondent admitted that he had traveled to Belize with Mrs. E and that he had stayed overnight in her home. He also admitted that he and Mrs. E had kissed and had embraced on at least two occasions while at her residence. Furthermore, he and Mrs. E used terms of endearment in their missives to each other during the course of Respondent's representation.[5]

---

2. C.R.S. § 14–10–110(1) provides that if both parties by petition or otherwise have stated under oath or affirmation that the marriage is irretrievably broken or one of the parties has so stated and the other has not denied it, there is a presumption of such fact, and, unless controverted by evidence, the court shall, after hearing, make a finding that the marriage is irretrievably broken. *See also Estate of Burford v. Burford,* 935 P.2d 943, 946 (Colo.1997).

3. *See* TMO, "Stipulation of Facts" at ¶ 5.

4. *See* Exhibit S, Bates Stamp R2–013–14 and R2–015–16.

5. *See* Exhibit V, Bates Stamp R2–056 and R2–047. Respondent testified that L, B stands for "Love, Bucky" (his nickname).

### Respondent Sets up an Office in the Parties' Marital Residence [6]

After Respondent agreed to represent Mrs. E, she allowed him to use her home as an office. As a result, Respondent kept Mrs. E's files in her home, as well as those concerning Respondent's former wife, another client Respondent represented in a pending divorce. In addition, Respondent hired Mrs. E to help him organize her case file and that of his former wife, Mrs. E's best friend. Respondent's ex-wife, and airline pilot, stayed with Mrs. E when she was back from work. Mrs. E testified that her home accommodated a large number of people and that she often welcomed friends and relatives to stay with her, including Respondent. Mrs. E's home, a large cabin with a private access, was located in a remote area west of Denver near Deer Creek.

While representing both his former wife and Mrs. E, Respondent admitted that he had spent the night at Mrs. E's residence approximately five to six times. Twice while staying overnight, Respondent slept with Mrs. E in her bed.[7] They had also spent over a week together in Belize at a property belonging to Respondent's former wife and her husband. Respondent and Mrs. E both characterized their trip to Belize as a business trip related to his former wife's divorce. Nevertheless, Mrs. E admitted that she and Respondent spent time together visiting the zoo in Belize, snorkeling with a friend of Mrs. E, and taking pictures that the parties' adult son later found on Respondent's laptop computer in Mrs. E's bedroom.

Although the primary legal issues in the divorce concerned division of marital property and maintenance, Mrs. E and Respondent wanted Mr. E to pay for counseling for the couple's adult children for the *alleged* sexual abuse Mr. E inflicted upon them as minors.[8] Given her husband's *alleged* sexual misconduct, Mrs. E felt concerned about her own safety and for the safety of her grandchildren who lived with her.[9] In addition, she felt disturbed by her adult son's disparaging comments about her and her relationship with Respondent. She felt that her husband had been manipulating their adult son.

Before Respondent commenced his representation of Mrs. E, the parties attempted to resolve the economic issues in their divorce.[10] However, after Mr. E and the parties' adult son accused his mother of having an affair with Respondent, Mrs. E wrote to Respondent, "I wish there was something I could do to expose how sick [my husband] is."[11] Respondent conducted the depositions of Mr. E and the parties' adult son following this note to Respondent.

### Depositions of Mr. E and the Parties' Adult Son Result in Respondent's Disqualification

By late October, in preparation for temporary orders, Respondent discovered that Mr. E had subpoenaed the parties' adult son to the temporary orders hearing. Sometime before the deposition of the parties' adult son, Mrs. E and her adult son had a falling out as a result of Respondent's relationship with Mrs. E. Mr. E's lawyer deposed Mrs. E earlier on the same day that Respondent deposed the parties' adult son.

Before Mr. E's attorney started questioning Mrs. E during her deposition, Respondent made a record in which he accused the parties' adult son of entering Mrs. E's home

---

6. Although it is not alleged that Respondent violated Colo. RPC 1.8, the Hearing Board notes that this rule prohibits a lawyer from entering into a *business transaction* with a client unless the transaction is fair to the client, the client is informed that consulting an independent lawyer may be advisable before entering the transaction, and the client consents in writing.

7. The parties stipulated that Respondent and Mrs. E did not have a sexual relationship and the Hearing Board accepted their stipulation. *See People v. Alexis*, 806 P.2d 929, 934 (Colo.1991) and CO–JICIV–1.11.

8. *See* Exhibit S, Bates Stamp R2–005.

9. Although it is not relevant to our findings in these proceedings, the Hearing Board heard testimony from Mrs. E that her husband had sexually abused her and her children when they were still living in the home.

10. *See* Exhibit S, Bates Stamp R2–004.

11. *See* Exhibit S, Bates Stamp R2–020. *See also* Exhibit 16, pages 40–41.

uninvited and spying on her, at Mr. E's direction. Respondent also warned the parties' adult son that he would call the police and have him arrested if he continued to enter the marital residence without Mrs. E's permission.

After addressing the dispute over the adult son's access to the home, Mr. E's lawyer conducted the deposition of Mrs. E. During the deposition, Mr. E's lawyer asked Mrs. E if she and Respondent had traveled to Belize together while Respondent represented her. While Mrs. E admitted they had traveled to Belize, she testified that it was a business trip related to Respondent's ex-wife's divorce. Mrs. E denied that she and Respondent had a romantic relationship or that Respondent had ever spent the night at her home in Colorado.[12] Nevertheless, Mrs. E admitted in these disciplinary proceedings that she and Respondent slept together at her residence, but denied that they engaged in sex at anytime.

In addition to asking whether Mrs. E had traveled to Belize with Respondent, Mr. E's lawyer asked her if she had any affairs during her marriage to Mr. E. He also asked Mrs. E if she had told the parties' adult children that their father had sexually abused them. Mrs. E answered that she had not told the children, but rather they had told her of the assaults. Mrs. E then detailed what her children had allegedly told her about Mr. E's sexual misconduct concerning the children as well as his affairs and other sexual improprieties that occurred during the marriage.[13]

In response to Mrs. E's detailed account of Mr. E's alleged sexually abusive conduct, Mr. E's lawyer stated to Mrs. E, "Okay. And all of this stuff you just told me, of what relevance is that in this case?" Mrs. E answered, "It might explain partially why I don't want to continue being married to the man." At that point, Mr. E's lawyer stipulated on the record that the marriage was "irretrievably broken." Mrs. E continued, "[w]ell, because perhaps it's not safe to have a predator out on the streets."

Mrs. E and Respondent agreed that Mr. E's lawyer questioned her in an accusatory, sarcastic, and badgering manner. Mrs. E described Mr. E's lawyer as a "bull in a china closet." Before Mrs. E's deposition, she and Respondent went to lunch and planned the examination of Mr. E, which had been scheduled that same afternoon. Mrs. E testified that she felt the need to tell her side of the story and respond to the manner in which Mr. E's attorney conducted her deposition. Mrs. E understood, planned, and approved of the strategy Respondent used in his questioning of her husband and the parties' adult son in depositions.

### Magistrate Disqualifies Respondent

Following Respondent's depositions of the parties' adult son and Mrs. E's husband, Mr. E's lawyer filed his second motion to disqualify Respondent. In the second motion to disqualify, Mr. E's lawyer detailed the questions Respondent asked, his manner in doing so, as well as Respondent's relationship with Mrs. E.

Mr. E's lawyer had previously filed a motion to disqualify Respondent on November 14, 2006, alleging a "personal, romantic, relationship between Mrs. E and Respondent based on an email sent to Mrs. E by Petitioner." The magistrate denied this motion. Respondent testified that he did not take this motion seriously, though he thereafter acted more cautiously in his relationship with Mrs. E and avoided sleeping in the same bed with Mrs. E when he spent the night at her house.

Unlike the previous motion to disqualify Respondent, Mr. E's attorney specifically alleged a *sexual* relationship between Respondent during the course of the representation.[14] Further, counsel for Mr. E detailed what he characterized as Respondent's irrelevant questions during the depositions, which "caused [the] case to be vexatious and contentious." Counsel also alleged that Respon-

12. *See* Exhibit 13, page 77.

13. *See* Exhibit 13, pages 78–82.

14. *See* Exhibit 5. Mr. E's lawyer first motion to disqualify Respondent was based upon general allegations of the close relationship between Respondent and Mrs. E. The court denied this motion.

dent based his "advice" [to Mrs. E in the divorce] on his desire for the sexual relationship.

In ruling on the motion to disqualify, the magistrate considered, among other things, the transcript of Respondent's deposition of the parties' adult son. The record in this case demonstrates Respondent questioned the parties' adult son on the following subjects:

- Whether his father ever had any inappropriate sexual contact with *anybody*. [Respondent went on to ask about alleged sexual encounters involving his father including one between Mr. E and his then 10–year–old daughter, the witness' little sister.]
- Whether the witness would "always be the guy who holds down the woman so your father can abuse her." [In context, this reference included the witness' 10–year–old sister.]
- Whether his father had ever "done you (the son)." [It is clear from the context that Respondent was asking the son if his father had ever sexually assaulted him.]
- Whether the son considered his father the "good guy" based upon the detailed sexual misconduct of Respondent.
- Whether the son had called his mother a "whore" and if so, why.[15]

In response to the latter question, the parties' adult son explained that he believed his mother was having an affair with Respondent. This deposition was heated.[16]

The magistrate considered not only Respondent's questioning of the parties' adult son and Mrs. E's husband, but also the fact that Respondent did *not* deny that the relationship between Respondent and Mrs. E had been sexual in nature.

Respondent appealed the magistrate's order to the district court. The district court affirmed the magistrate's order of disqualification. In its written order, the district court found that the court's file "replete" with "indications" that Respondent's relationship with Mrs. E, "contributed to enormous hostility between the parties and their lawyers." [17]

### Testimony of Respondent

Respondent testified that he did not have a sexual or romantic relationship with Mrs. E., although he admitted that he slept in the same bed with her and took a weeklong trip with her to Belize. Nevertheless, Respondent testified that he did not then and does not now find his relationship with Mrs. E to be problematic. He has always had close relationships with his clients and it is not uncommon for him to sleep overnight at clients' houses during the course of his representation of them. However, he admits he has never slept in the same bed of a female client as he did with Mrs. E. Further, Respondent emphasized that the parties had stipulated that the relationship between Respondent and Mrs. E was not sexual.[18]

Respondent testified that he believes that he acted legally and ethically in questioning Mr. E and his adult son for the following reasons:

- He asked questions within the scope of discovery because of their relevance to the issue of economic fault.
- He asked questions proper for the purpose of demonstrating bias and lack of credibility.
- Although Mr. E's counsel stipulated on the record that the marriage was irretrievably broken, Respondent nevertheless had the right to ask the questions

---

15. *See generally* Exhibit 16, the adult son's deposition. *See also In re Marriage of Franks*, 189 Colo. 499, 542 P.2d 845–50 for discussion regarding needless hostility between the parties when issues of "fault" under our previous divorce laws.

16. *See* Exhibit 16, pages 35–36. The Hearing Board chooses not to detail the questions and answers in this heated exchange but agrees with

the magistrate's characterization of this exchange as "vile."

17. *See* Exhibits 6 and 12.

18. The parties stipulated, "The Respondent did not have a sexual relationship with Ms. [E]." *See People v. Alexis*, 806 P.2d 929, 934(Colo.1991) and CO–JICIV–1.11 (a jury [trier of fact] "must accept" that the stipulated facts are true).

about whether the marriage was in fact irretrievably broken, because Mr. E had not admitted the same in his answer to Mrs. E's divorce petition.

- Unless and until the stipulation that the marriage was irretrievably broken was in writing and accepted by the court, it was appropriate for him to ask the questions about sexual misconduct.
- He was duty bound to zealously represent his client who had valid concerns for her safety and that of her grandchildren, ages 4 and 5, who lived with her in a remote area.[19]
- The only way to deal with a "sexual predator" and his victims is to speak directly and openly about the subject, which he attempted to do with the parties' son.
- Mr. E's attorney, not Respondent, acted unprofessionally. Furthermore, Respondent had a right to respond to Mr. E's false accusations of misconduct on the part of Mrs. E.

As to the People's allegation that his relationship with his client caused a conflict that was prejudicial to the administration of justice, Respondent testified that he thoroughly discussed the issue of a conflict with Mrs. E and researched the same.[20] After researching the law, conferring with other lawyers, and his client, Respondent and Mrs. E mutually agreed that he could continue to represent her. Although their relationship was close, it was not sexual and therefore no conflict existed.

But even if a conflict existed, Respondent testified that he believed Mrs. E had waived any conflict after he fully discussed the matter with her. Respondent admitted, however, that he did not direct Mrs. E to consult with independent counsel on this issue. Respondent testified that Mr. E's motion to disqualify Respondent was specious and sim-

ply a trial tactic designed to strip Mrs. E, a client with no funds, of his *pro bono* services. Respondent believed that if he withdrew, Mrs. E would not be able to find other counsel to represent her in the divorce proceeding, particularly on a *pro bono* basis.

### Expert Witness Testimony

Upon stipulation of the parties, former Denver District Court Judge Federico Alvarez testified as an expert in civil and domestic litigation as well as legal ethics. Mr. Alvarez served as a district court judge in Denver from approximately 1989 to 1998. During that time, he presided over hundreds of domestic cases. He now dedicates 40% of his practice to domestic cases.

After studying the pleadings, Respondent's Answer, other relevant documents including court orders disqualifying Respondent, and the stipulated deposition transcripts, Mr. Alvarez concluded that the only real issues to be resolved in this divorce were the division of marital assets and maintenance.[21]

Mr. Alvarez opined that once a party claims that the marriage is irretrievably broken, marital misconduct in the form of extramarital sex or other misconduct is irrelevant. He testified that given the social and emotional dynamics of a divorce proceeding, counsel representing a party in a divorce must advise clients that marital fault is not a relevant issue and that going forward on that issue might be harmful to the client's case.[22] Mr. Alvarez further opined that given these legal parameters, Respondent's questioning of Mr. E and his son went beyond normally accepted legal standards. Mr. Alvarez stated that real issues of economic fault or other theories existed that might have justified the questioning Respondent conducted on behalf of his client.

19. *See* Exhibit S, Bates Stamp, R2–005.

20. *See* Exhibit R.

21. *See* Exhibit S, this is an email dated October 13, 2006, which demonstrates that Mrs. E was concerned about financial issues, not marital fault, before allegations of her relationship with Respondent surfaced.

22. Mr. Alvarez acknowledged that there are circumstances where marital fault may be relevant. For example, if a spouse spends substantial sums on a paramour, which affects the amount of money available to the marital estate, this would be relevant to the issue of property division.

Finally, Mr. Alvarez opined that Respondent's intimate relationship with Mrs. E compromised Respondent's ability to maintain the detachment and independence needed to guide Mrs. E. through her divorce. Parties often act out of character in the throws of a divorce. In Mr. Alvarez's experience, most parties to a divorce action are extremely emotionally vulnerable. Thus, they are dependent upon legal counsel's professionalism and detachment to avoid issues not legally germane to the proceedings.

## IV. CONCLUSIONS OF LAW— SUBSTANTIVE ALLEGATIONS

■■■ The Hearing Board finds clear and convincing evidence as to the following claims in the People's complaint:

- Claims One and Two, Colo. RPC 4.4 (in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person). Respondent's questioning of Mrs. E's husband and the parties' adult son served no substantial legal purpose other than to burden them. The appropriate amount of maintenance and division of the martial assets were the only legal issues in the case.[23] Respondent's questions of Mr. E and the parties' 'adult son abused the legal process. While the information sought in discovery need not be admissible at trial, it must at least be reasonably calculated to lead to the discovery of admissible evidence. *See In re Attorney D*, 57 P.3d 395, 399 (Colo.2002) *citing Martinelli v. District Court*, 199 Colo. 163, 168, 612 P.2d 1083, 1087 (1980).

  After Mrs. E's son publicly called her a "whore," it is understandable that Mrs. E felt the need to strike back at him and her husband. Even though Mrs. E wanted to retaliate, Respondent was not at liberty to do so. Respondent had a duty to follow the legal and ethical rules and remain professionally detached. Instead, he blindly obeyed his client's wishes because of the nature of his relationship with her.

- Claim Four, Colo. RPC 1.7(b) (a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests) (emphasis added). While Respondent argued that his relationship with Mrs. E was proper because it was not sexual, we disagree. In fact, the nature of the relationship was so close that Respondent compromised his responsibilities to his client. As demonstrated by Respondent's questioning of Mr. E and the parties' adult son, Respondent lost his legal and ethical moorings. Whether Respondent engaged in a *sexual* relationship with Mrs. E or not, is irrelevant to our analysis. We look at the close personal nature of the relationship as well as the consequences flowing therefrom.

  Respondent literally lived, worked, and traveled with an emotionally strained client throughout his representation of her. Mrs. E admitted that she had thrown herself at him. Most important, however, Respondent saw himself as Mrs. E's personal protector, as opposed to her counsel in her divorce from Mr. E. In this role, he lost all objectivity and the independent judgment he needed to help Mrs. E navigate through an emotionally trying divorce. Had Respondent zealously represented his client as he claims, he would not have engaged in or fostered the relationship that led to his disqualification.

  Further, the Hearing Board specifically finds that Respondent violated Colo. RPC 1.7(b), even though the record showed that he had consulted with his client and obtained an ostensible waiver from her. In addition, although Respondent subjectively believed no conflict existed, his belief was unreasonable. We find that under the circumstances, Mrs. E's ability to make an informed decision

---

23. Though Respondent argued that his questioning of Mr. E was permissible under an economic fault theory, we find that the expert's testimony

on this point is clear and convincing. *See In re Marriage of Hunt*, 909 P.2d 525, 542 (Colo.1995).

on this issue had been severely compromised.

- Claim Five, Colo. RPC 8.4(d) (it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice). Respondent engaged in conduct prejudicial to the administration of justice for the reasons enumerated above.

## V. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

### Analysis Under the ABA Standards

Suspension is generally appropriate when a lawyer *knowingly* fails to comply with a court rule and causes potential interference with a legal proceeding. Reprimand is generally appropriate when a lawyer is *negligent* in determining whether the representation of a client may be materially affected by the lawyer's own interests and he thereby causes potential injury to the client. *See* ABA *Standards* 6.22 and ABA *Standards* 4.33, respectively. However, in imposing a sanction after a finding of lawyer misconduct, ABA *Standard* 3.0 directs the Hearing Board to first consider the following factors:

(1) the duty violated;

(2) the lawyer's mental state;

(3) the actual or potential injury caused by the misconduct; and

(4) the existence of aggravating or mitigating factors.

### A. THE DUTY VIOLATED

Respondent violated duties to his client by failing to recognize that his relationship with his client created a conflict which affected his ability to exercise independent and professional judgment on her behalf. As a lawyer, Respondent owed a fiduciary duty to his client to act in her best interests within the context of the legal proceedings. Respondent's conduct as presented in these proceedings cannot be described as zealous legal representation; it was representation misdirected by intimacy and romance.

Further, Respondent violated his duty to the legal system. The magistrate's findings in disqualifying Respondent help demonstrate this breech. In his minute order, the magistrate found:

> [I]t is the abuse of the process that [the party's son] has to be cross examined by an attorney he believes to be having sexual relations with his mother. Attorney Beecher does not deny the allegations he is having a sexual relationship with the petitioner. This *appearance* creates such hostility and conflict that the integrity of the proceedings are [sic] placed in jeopardy (emphasis added).

We find clear and convincing evidence to support the magistrate's finding that Respondent's conduct placed the integrity of the judicial proceedings in jeopardy. Further, we find clear and convincing evidence that Respondent violated his duty to the legal system by essentially using legal proceedings; that is depositions, to burden his client's husband and the parties' adult son with irrelevant and loathsome questions that served no *substantial* legal purpose. Respondent should have understood that conducting the depositions of Mr. E and the parties' adult son in this manner was at odds with his professional responsibilities. As a fiduciary to his client, Respondent should have explained the danger in questioning witnesses where there was no substantial purpose in doing so other than to harass.

### B. THE LAWYER'S MENTAL STATE

The Hearing Board finds that Respondent's state of mind was negligent in failing to recognize the conflict his representation of Mrs. E presented; that is, he failed to heed a substantial risk that the court would find a conflict, and his failure to appreciate the same was a deviation from the standard of care a reasonable lawyer would exercise.

However, we further find that Respondent's conduct in the depositions was knowing; that is, Respondent was aware of his

conduct. Indeed, he and his client planned the strategy Respondent used at the depositions. Even though Respondent was aware of his conduct and the attendant circumstances that resulted from it, he did not have the conscious objective of harassing Mr. E and the parties' adult son. Respondent still believes he acted appropriately in representing Mrs. E.

In short, Respondent's emotional commitment to Mrs. E compromised his professional judgment.

## C. THE ACTUAL OR POTENTIAL INJURY

Respondent's personal relationship with his client caused actual and potential injury to her. Inherently, this relationship damaged Respondent's ability to act as Mrs. E's legal fiduciary. Although Mrs. E was not sanctioned as a result of a misdirected strategy she and Respondent adopted, there was the potential for such sanctions. Their relationship not only fostered hostility in her family, but caused harm and potential harm to the judicial process and its integrity. Respondent's scurrilous questions and statements during the depositions in question served no substantial purpose other than to burden and harass. Finally, as a result of Respondent's conduct and disqualification, Mrs. E had to proceed in the divorce *pro se.*

## D. AGGRAVATING AND MITIGATING FACTORS

### 1. MATTERS IN AGGRAVATION, ABA *STANDARD* 9.2

The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction.

### Pattern of Misconduct and Multiple Offenses—9.22(c) and (d)

Had Respondent's misconduct been isolated or in the heat of battle, we may have found a public censure appropriate. However, Respondent engaged in a long-term, non-professional, relationship with his client. Further, the crass inquiries Respondent made of Mr. E and the parties' adult son were not in the heat of the moment. They were well planned.[24]

### Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g)

Respondent fails to understand the consequences of his relationship with Mrs. E, its influence on the judicial proceedings, and the harm he has caused to the reputation of the legal profession. Respondent maintains that his relationship with his client was appropriate because it was not "sexual." He was only "helping a friend." While the Hearing Board strongly disagrees with Respondent on this issue, it nevertheless finds Respondent's testimony on this issue to be sincere.

### Vulnerability of the Victim—9.22(h)

Any party to a divorce, especially one that is as emotionally charged as this one, is vulnerable. Mrs. E's husband was represented; she was not. Further, she did not have the funds to hire a lawyer. She admits "throwing" herself at Respondent and kissing him, but he rejected her advances. She also testified that she was emotionally weakened by the divorce. This testimony demonstrates the obvious; Mrs. E needed sound legal counsel, not advice or strategy that could place her in jeopardy of sanctions. As Mr. Alvarez pointed out, courts are not inclined to approve of the tactics Respondent used here.

### Substantial Experience in the Practice of Law—9.22(i)

Respondent has practiced law for approximately twenty years and had sufficient experience in domestic cases to know that he acted inappropriately.

---

24. *See* Exhibit 12, page 3. Though there was no apparent reason for doing so, Respondent also subpoenaed a third party, the husband of Respondent's former wife, to the depositions he conducted. It is clear from the depositions transcripts that some of the exchanges during the depositions were quite heated. It is equally clear from the testimony, that the deposition questions asked by Respondent were planned well in advance of the depositions.

## 2. MATTERS IN MITIGATION, ABA STANDARD 9.3

The Hearing Board considered evidence of the following mitigating circumstances in deciding the appropriate sanction.

### Absence of Prior Discipline—9.32(a)

Respondent has practiced in a firm, as a solo lawyer, and as a city attorney. In over twenty years of practice, he has no prior discipline of any sort. The Hearing Board gives *substantial* weight to this factor. Finally, Respondent also testified and the People agree that he has often volunteered his services *pro bono* through the Colorado Bar Association.

### Cooperative Attitude in the Proceedings—9.32(e)

Although Respondent vigorously defended himself in these proceedings, he was cooperative and respectful throughout.

### Remorse—9.32(m)

Although Respondent fails to recognize that his conduct violated the disciplinary rules outlined above, he expressed remorse for harm he has caused. At the same time, he blames his opponent and Mrs. E's husband for creating rancor in the proceedings. He responded to this acrimony. While we agree our reading of the deposition transcripts demonstrates that Mr. E's lawyer's conduct contributed to the hostility between the parties, Respondent's behavior in the depositions cannot be excused.[25] We therefore give this mitigating factor little weight.

### *Analysis Under Case Law and ABA Standards*

While there is no Colorado case law directly addressing the issues presented here, we find that Respondent's personal relationship with Mrs. E, albeit non-sexual, undermined Respondent's professional integrity, judgment and fiduciary duties to his client in the same manner as if he had a sexual relationship with a client. *See People v. Good,* 893 P.2d 101, 103 (Colo.1995) and *People v. Boyer,* 934 P.2d 1361, 1363 (Colo.1997).

In *Good* and *Boyer,* the Colorado Supreme Court approved lengthy suspensions. In both these cases, there was clear and convincing evidence that the lawyers engaged in a sexual relationship with their respective clients, as well as other serious misconduct. In looking at the facts in these cases, we find Respondent's misconduct to be serious, but less so than reported in these cases. We therefore recommend a short, rather than a lengthy, suspension.

Here, Respondent acted negligently in continuing to represent a client when a conflict arose. Respondent acted knowingly in conducting the depositions of Mr. E and the parties' adult son, but it is not clear nor convincing that Respondent acted with a conscious objective or purpose of embarrassing, delaying or burdening these deposed witnesses as provided in Colo. RPC 4.4.[26] Respondent, nevertheless, without proper reflection and independent judgment, knowingly adopted his client's wish to aggressively question her husband and son on an array of issues that exacerbated familial hostility and harmed the integrity of the judicial process.[27]

Misguided sarcasm, unnecessary combativeness, and gratuitous intimidation should never be part of a lawyer's arsenal of zealous advocacy on behalf of a client. *See In the Matter of Golden,* 329 S.C. 335, 496 S.E.2d 619, 622 (S.C.1998) and *Matter of Vincenti,* 92 N.J. 591, 458 A.2d 1268, 1274 (N.J.1983).

## VI. CONCLUSION

Although Respondent's claims that he asked the questions of Mr. E and the parties'

---

25. At one point in Mrs. E's deposition, Mr. E's lawyer told Respondent, "counsel, you are full of shit."

26. *See* ABA *Standards,* Definitions. "Intent is the conscious objective or purpose to accomplish a specific result."

27. *See In re Disciplinary Action Against Dvorak,* 611 N.W.2d 147, 151 (N.D.2000) ("[A] lawyer shall not ... act on a client's behalf only to harass or maliciously injure another.").

adult son for a substantial legal purpose, this argument rings hollow when examining all of the evidence. Objectively, Respondent's questions embarrassed, harassed, and burdened these witnesses. But for Respondent's intimate and personal relationship with his client, it is doubtful that he would have conducted himself in such an unabashed manner. Indeed, Respondent testified that he is normally reserved and calm when representing his clients.

One of the primary goals of our disciplinary system is to protect the public from lawyers who potentially pose a danger to them. In this case, Respondent's misconduct actually harmed his client and the legal system. Even though the parties stipulated that Respondent did not engage in a sexual relationship with Mrs. E, their amorous and intimate relationship was inherently damaging to the attorney-client relationship and the integrity of the judicial process.

## VII. *ORDER*

The Hearing Board therefore **ORDERS**:

1. Norman B. Beecher, Attorney Registration No. 12722, is hereby **SUSPENDED** from the practice of law in the State of Colorado for a period of **ONE YEAR AND ONE DAY, ALL BUT NINETY (90) DAYS STAYED** upon the successful completion of a two-year period of probation with conditions, effective thirty-one (31) days from the date of this order.

2. Respondent **SHALL** attend and successfully pass the one-day ethics school sponsored by the People within one year of the date of this order. Respondent shall register and pay the costs of ethics school within thirty (30) days of the date of this order.

3. Respondent **SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this order. Respondent shall have ten (10) days thereafter to submit a response.