1
 2025 CO 12 In the Matter of Igor Raykin Attorney-Respondent: No. 24SA216
Supreme Court of Colorado, En Banc
March 24, 2025
 
          
 Original Proceeding in Discipline Appeal from the Presiding
 Disciplinary Judge, 23PDJ046
 
 2
 
          
 Attorney-Respondent Igor Raykin, pro se Aurora, Colorado
 
 
          
 Attorneys for the People of the State of Colorado: Jessica E.
 Yates, Attorney Regulation Counsel Jonathan P. White,
 Assistant Regulation Counsel Denver, Colorado
 
 
          
 JUSTICE HART delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE GABRIEL, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 3
 
          
 OPINION
 
 
           HART,
 JUSTICE
 
 
          ¶1
 This matter asks us to consider the relationship between the
 Colorado Rules of Professional Conduct and the American Bar
 Association's ("ABA") Standards for Imposing
 Lawyer Sanctions (Am. Bar Ass'n, 2d ed. 2019) ("ABA
 Standards"), when the Office of the Presiding
 Disciplinary Judge ("PDJ") imposes sanctions on an
 attorney for violating our rules of professional conduct.
 
 
          ¶2
 In May 2022, during a meeting with the staff of the Mesa
 County Valley School District 51 (the "school
 district"), attorney Igor Raykin directed several
 inappropriate expletive-laden outbursts at the staff in the
 presence of his minor client and his client's parents.
 Raykin's conduct at the meeting was reported to the
 Office of Attorney Regulation Counsel ("OARC").
 OARC investigated and filed a complaint with the PDJ, (1)
 alleging that Raykin had violated Colo. RPC 4.4(a), which
 addresses an attorney's respect for the rights of third
 persons, and (2) seeking sanctions for the violation.
 
 
          ¶3
 A Hearing Board concluded that Raykin's conduct at the
 meeting violated Colo. RPC 4.4(a) because the conduct had no
 substantial purpose other than to delay, embarrass, or burden
 the school district's staff. After weighing the
 aggravating and mitigating circumstances, the Hearing Board
 determined that the appropriate sanctions were a public
 censure and an independent medical examination
 ("IME").
 
 4
 
          ¶4
 Raykin appealed the Hearing Board's determination, as
 well as two other PDJ orders, to this court. Raykin's
 primary objection to the Hearing Board's sanctions relies
 on the language and structure of the ABA's Standards for
 Imposing Lawyer Sanctions, which we use as "our guiding
 authority" in determining appropriate sanctions. In
 re Rosen, 198 P.3d 116, 119 (Colo. 2008). We take this
 opportunity to make clear that the ABA's standards are a
 starting point-an important guiding authority-but not a text
 that supersedes the Colorado Rules of Professional Conduct.
 In this case, the PDJ correctly determined that Raykin's
 conduct violated his duties as a professional. The sanctions
 imposed are appropriate, and we affirm the Hearing
 Board's final decision and the PDJ's denial of both
 prehearing motions.[1]
 
 5
 
          I.
 Facts and Procedural History
 
 
          ¶5
 This matter involves events that occurred during a May 18,
 2022 meeting with the school district's staff to review
 the Individual Education Plan ("IEP") of one of
 Raykin's clients. The meeting was hybrid, with Raykin,
 his client, and the client's parents attending remotely.
 
 
          ¶6
 The school district's representatives in attendance
 included Tammy Eret Lynch, the school district's outside
 counsel; Walter Fox, a special education instructor; and Jan
 Blair, a special education consultant who led the meeting.
 
 
          ¶7
 Over the course of the approximately eighty-minute call,
 Raykin made several profane and disparaging comments directed
 toward the school district's staff that started about
 twenty-three minutes into the meeting. During an argument
 with Blair, Raykin said, "Shut up, Jan." A few
 seconds later, he pointed his finger at the screen and again
 said, "Shut up, Jan." A minute later, Raykin told
 Blair again to shut up.
 
 
          ¶8
 Soon after, apparently having received an incorrect document
 by email, Raykin said the following to Blair and Lynch:
 "You people can't even send the right f**king
 document." Lynch told Raykin that he should not be
 cursing in the meeting, to which he replied, "I sure as
 f*** am." Blair muted Raykin the next time he began
 cursing. Raykin unmuted himself and said, "Every time I
 unmute myself, I'm going to say f*** again. That's
 how I am going to start every sentence."
 
 6
 
          ¶9
 A few minutes later, Raykin called Blair a "miserable
 person." He then said, "One of us is a lawyer, and
 the other one is you." Approximately two minutes later,
 Blair told Raykin, "We wish you would be quiet," to
 allow the meeting to continue. Raykin replied to Blair,
 saying, "I wish you would actually stop working here and
 go work where you really belong, which is in the gutter, ok?
 So please go ahead and get yourself employed where you need
 to be."
 
 
          ¶10
 About sixty-two minutes into the meeting, Blair interrupted
 Raykin. Raykin responded by saying, "My God, Jan, you
 really don't know how to shut up, do you? I mean, it is
 unbelievable how little you actually listen to people. You
 are an incredible person." A few seconds later, Raykin
 said, "Jan, really, I feel so bad for your
 ex-husbands," after which someone snickered. Toward the
 end of the meeting, Raykin shook his finger at Blair and Fox
 and said, "I don't like you." Raykin went on to
 say he was frustrated and his frustration was why he
 continued using the word "f***." A few minutes
 later, Raykin commented, "You guys are full of
 s***," followed by him telling Lynch and Blair to
 "shut the f*** up" shortly before the meeting
 ended.
 
 
          ¶11
 The next day, Raykin sent an email to Lynch referring to
 Blair as a "despicable creature and a cancer to
 kids."
 
 
          ¶12
 After a request for investigation was filed with OARC, Raykin
 submitted his initial response on August 24, 2022. In this
 response letter he wrote, "I did call
 
 7
 
 Blair a 'despicable creature and a cancer to kids.'
 Ok, I like to call things what they are." Raykin further
 wrote, "If I have to scream at someone or intimidate
 them or release my anger in order to get what's best for
 a [child with special needs], then so be it." In the
 same response letter, Raykin stated, "I have attention
 deficit disorder, intermittent explosive disorder, and
 oppositional defiant disorder. Frankly, I don't think any
 of these things are 'disorders.' I have dealt with
 these things since adolescence." Raykin also wrote,
 "But sometimes these conditions are useful. And if these
 conditions are necessary to represent kids more effectively,
 then I suppose that having them is better than not having
 them." He further commented, regarding the school
 district, "If they want to bully my clients by smiling
 in their faces while preparing to screw them over, then
 I'm going to bully them back."
 
 
          ¶13
 On November 23, 2022, Raykin wrote a supplemental response to
 OARC. In it, he mentioned again that he has been diagnosed
 with various disorders, including intermittent explosive
 disorder. He said he understood how his earlier response
 letter could be "hurtful," and that it was
 "unproductive," "dumb," and
 "selfish."
 
 
          ¶14
 On February 29, 2024, Raykin wrote a letter of apology to
 Blair, Lynch, Fox, and the other school district employees
 who attended the May 18, 2022 meeting. In it, he acknowledged
 victimizing people in the room. He admitted to being "a
 
 8
 
 bully, an immature person who couldn't control himself, a
 hypocrite, a person who was setting a terrible example for
 the kid he was representing." He also wrote,
 "I'm not the kind of person who changes through
 positive rewards. I'm much more likely to change when the
 consequences of not doing so are simply too heavy." He
 described working on his anger, including through cognitive
 behavioral therapy, to help with self-control. He said he
 took medication for his disorder, including on the day of the
 IEP meeting, but that "didn't stop [him]." He
 commented that working on his anger would be an "ongoing
 process" and one "without end."
 
 
          ¶15
 OARC scheduled a two-day disciplinary hearing, during which
 Raykin testified to the Hearing Board. He explained that
 growing up, "yelling was just normal in my family"
 and was how they expressed themselves. He recalled having
 anger issues in adolescence that included breaking things. He
 spoke of his anger costing him jobs, relationships, and
 friendships. He testified that when he started practicing law
 and representing students in special education, he took a
 conciliatory approach. He believed this approach was
 ineffective, so he changed his approach to "bringing the
 fight."
 
 
          ¶16
 Raykin acknowledged he previously had "other
 outbursts" in his legal practice, but none like that at
 the IEP meeting. Raykin said that approximately ten years ago
 he began to accept that he has a mental health issue. He
 detailed for the
 
 9
 
 Hearing Board taking medication to treat his anger issues and
 how this helped but did not fully resolve the episodes. He
 began seeing an anger management specialist during OARC's
 investigation, and he argued that he viewed his mental health
 issues as a mitigating factor in the case.
 
 
          ¶17
 The Hearing Board asked Raykin if he was amenable to an IME.
 Raykin responded, "I am amenable to everything. So
 regardless of whether this is a private admonition or a
 public censure, you know, that's not my primary concern
 here. My primary concern is I don't want to have these
 episodes, outbursts, again, in my private life or my
 professional life ...."
 
 
          ¶18
 The Hearing Board concluded that Raykin violated Colo. RPC
 4.4(a) during the meeting with the school district. And in
 determining the appropriate sanctions, the Hearing Board
 appropriately noted that the ABA's standards and Colorado
 Supreme Court case law guide the imposition of sanctions for
 lawyer misconduct.
 
 
          ¶19
 The Hearing Board first identified the relevant ABA Standards
 for consideration: 3.0 (duty, mental state, and injury),
 4.0-7.0 (presumptive sanctions), and 9.0 (aggravating and
 mitigating factors). After articulating the relevant
 aggravating factor and various mitigating factors, the
 Hearing Board began its analysis with ABA Standard 7.2,
 noting that it was the proper starting point based on three
 other Colorado disciplinary cases where the PDJ had imposed
 suspension
 
 10
 
 as a sanction for a violation of Colo. RPC
 4.4(a).[2] However, the Hearing Board found that ABA
 Standard 7.2-while it presumes a sanction of suspension-was a
 starting point, but did not dictate which sanction should be
 imposed in Raykin's case. Instead, after applying
 mitigating credit, the Hearing Board concluded that a public
 censure and an IME would most appropriately address
 Raykin's conduct and support his continuing work as an
 attorney.
 
 
          ¶20
 The PDJ ultimately issued an opinion that ordered Raykin be
 publicly censured, and that he obtain, at his own expense, an
 IME by a qualified examiner to address his diagnoses.
 
 
          ¶21
 Raykin filed a notice of appeal with this court pursuant to
 C.R.C.P. 242.33.
 
 
          II.
 Standard of Review
 
 
          ¶22
 This court has plenary power "to review any
 determination made in a [lawyer disciplinary] proceeding . .
 . and to enter any order in such a proceeding." C.R.C.P.
 242.2. We review the Hearing Board's conclusions of law
 de novo and its findings of fact for clear error. C.R.C.P.
 242.33(c). "We will affirm a hearing board's
 decision unless we determine that its findings of fact are
 clearly erroneous or that the form of discipline imposed is
 manifestly excessive, bears no relation to
 
 11
 
 the complained-of conduct, or is otherwise
 unreasonable." In re Abrams, 2021 CO 44, ¶
 13, 488 P.3d 1043, 1050.
 
 
          ¶23
 We review questions of court rules interpretation de novo.
 People v. Maes, 2024 CO 15, ¶ 11, 545 P.3d 487,
 490. In so doing, we employ the same techniques used to
 interpret statutes. Id. We first look to the
 language of the rule, reading the words and phrases in
 context and construing them according to rules of grammar and
 common usage. People v. Cali, 2020 CO 20, ¶ 15,
 459 P.3d 516, 519. If a rule is unambiguous, we apply it as
 written. Id. at ¶ 18, 459 P.3d at 519.
 
 
          III.
 Analysis
 
 
          ¶24
 Raykin appeals the Hearing Board's conclusion that he
 violated Colo. RPC 4.4(a) and challenges the sanctions that
 the Hearing Board imposed. We address each issue in turn.
 
 
          A.
 Finding that Raykin Violated Colo. RPC 4.4(a)
 
 
          ¶25
 Raykin challenges the Hearing Board's ultimate finding
 that he violated Rule 4.4(a). But he does not challenge the
 factual findings of the Hearing Board and, indeed, admits
 that his behavior at the IEP meeting was inappropriate.
 Instead, he argues that Rule 4.4(a) does not prohibit his
 conduct because the rule applies only to lawyer conduct
 involving methods of obtaining evidence. We conclude that the
 rule is not limited in this way for two reasons.
 
 12
 
          ¶26
 Colo. RPC 4.4(a) states, "In representing a client, a
 lawyer shall not use means that have no substantial purpose
 other than to embarrass, delay, or burden a third person, or
 use methods of obtaining evidence that violate the legal
 rights of such a person."
 
 
          ¶27
 This rule does contain a limitation: its application is
 limited by the opening clause to conduct that occurs when a
 lawyer is representing a client. Raykin argues that the
 entire rule is further limited by its final clause to conduct
 that pertains to a lawyer's methods of obtaining
 evidence. He is incorrect.
 
 
          ¶28
 As we have previously explained, when the word "or"
 is used in a statute, "it is presumed to be used in the
 disjunctive sense, unless legislative intent is clearly to
 the contrary." Armintrout v. People, 864 P.2d
 576, 581 (Colo. 1993). In other words, by separating the
 first set of prohibitions in Colo. RPC 4.4(a)-using
 "means that have no substantial purpose other than to
 embarrass, delay, or burden a third person,"-from the
 second-using "methods of obtaining evidence that violate
 the legal rights of such a person"-with the word
 "or," the rule indicates two different
 prohibitions. Nothing in Rule 4.4(a) supports a reading that
 prohibits lawyer conduct that has "no substantial
 purpose other than to embarrass, delay, or burden a third
 person" only when such conduct relates to obtaining
 evidence.
 
 13
 
          ¶29
 A second indicator is the use of different words to describe
 the actions prohibited under the rule-"methods"
 rather than "means." Rule 4.4(a) prohibits a lawyer
 from using (1) "means that have no substantial purpose
 other than to embarrass, delay, or burden a third
 person"; and (2) "methods of obtaining
 evidence that violate the legal rights of such a
 person." When a lawyer engages in either type of
 conduct, each instance is individually sufficient to support
 a finding that the lawyer violated the rule.
 
 
          ¶30
 Here, the Hearing Board reasonably concluded that
 Raykin's conduct at the IEP meeting served no purpose
 other than to embarrass, delay, or burden a third person.
 Raykin himself described his conduct during the OARC process
 as "hurtful," "dumb," and
 "selfish," and admitted to having been a
 "bully" and a "terrible example" to his
 client. We therefore affirm the Hearing Board's
 conclusion that Raykin violated Colo. RPC 4.4(a).
 
 
          B.
 Imposition of Sanctions
 
 
          ¶31
 Raykin further argues that the sanctions he received were
 both excessive and impermissible. His argument starts with a
 somewhat technical but very important premise. Raykin asserts
 that ABA Standard 7.2, which the Hearing Board relied on as a
 starting point to determine the appropriate sanction, cannot
 apply to him because it is a subcategory of ABA Standard 7.0,
 "Violations of Duties Owed as a Professional," and
 because the language of ABA Standard 7.0 limits
 
 14
 
 those duties to a particular set of conduct. His conduct, he
 argues, is not covered in that set. Importantly, however, we
 have been clear that the ABA Standards are a guide
 for when the PDJ imposes sanctions, and we review sanctions.
 They are not the final word.
 
 
          1.
 Violation of Duties Owed as a Professional
 
 
          ¶32
 ABA Standard 7.0 is the only ABA Standard that specifically
 addresses the duties attorneys owe as professionals. That
 standard reads as follows:
 
 
 Absent aggravating or mitigating circumstances, upon
 application of the factors set out in Standard 3.0, the
 following sanctions are generally appropriate in cases
 involving false or misleading communication about the lawyer
 or the lawyer's services, improper communication of
 fields of practice, improper solicitation of professional
 employment from a prospective client, unreasonable or
 improper fees, unauthorized practice of law, improper
 withdrawal from representation, or failure to report
 professional misconduct.
 
 
          ABA
 Standard 7.0.
 
 
          ¶33
 The ABA Standards are structured such that 7.1, 7.2, 7.3, and
 7.4 are listed underneath 7.0 as the sanction types that are
 "generally appropriate" for different levels of
 misconduct listed in 7.0. The Hearing Board's starting
 point for Raykin's sanction was ABA Standard 7.2, which
 provides, "Suspension is generally appropriate when a
 lawyer knowingly engages in conduct that is a violation of a
 duty owed as a professional and causes injury or potential
 injury to a client, the public, or the legal system."
 
 15
 
          ¶34
 But the Colorado Rules of Professional Conduct include many
 other duties owed as a professional beyond those listed in
 ABA Standard 7.0. Some of them are covered by other ABA
 Standards, but not all. Raykin's conduct here is a good
 example. No one-not even Raykin himself-would argue that his
 behavior met professional standards. He has admitted as much.
 It would be absurd to conclude that because the ABA Standards
 do not specifically prohibit acting like "a bully, an
 immature person who couldn't control himself, a
 hypocrite, [and] a person who was setting a terrible
 example" at a meeting while representing a minor client,
 such behavior does not violate an attorney's professional
 duties.
 
 
          ¶35
 Moreover, while the text of the ABA Standards themselves
 might suggest a closed set of professional duties, the
 annotations explain otherwise. "Courts impose
 suspensions under Standard 7.2 for various other kinds of
 misconduct that violates the lawyer's duty owed as a
 professional." ABA Standard 7.2 annotation (Other
 Misconduct) (emphasis added).
 
 
          ¶36
 Both our court and others have relied on ABA Standard 7.2 to
 impose sanctions on a lawyer who violated a duty not
 enumerated in ABA Standard 7.0. For example, in People v.
 Easley, 956 P.2d 1257, 1259 (Colo. 1998), we relied on
 ABA Standard 7.2 to suspend a lawyer who engaged in a sexual
 relationship with a client who was a plaintiff in a sexual
 harassment lawsuit. In a Louisiana case, a lawyer contributed
 to the legislative campaign of a judge's niece following
 a
 
 16
 
 favorable judgment entered by that judge. In re
 LeBlanc, 972 So.2d 315, 319 (La. 2007). The Supreme
 Court of Louisiana imposed sanctions, relying on ABA Standard
 7.2 as a starting point to determine the appropriate sanction
 and concluded that the lawyer had "violated duties owed
 to the legal system and to the profession." Id.
 
 
          ¶37
 In Rosen, we held that while the ABA Standards
 enumerate aggravating and mitigating factors in prescribing
 discipline, those factors are intended as
 illustrative and "are not to be applied
 mechanically in every case." 198 P.3d at 121. We
 conclude similarly here that the ABA Standards are a guiding
 authority, but they do not limit sanctions under ABA Standard
 7.2 to conduct enumerated in ABA Standard 7.0.
 
 
          IV.
 Conclusion
 
 
          ¶38
 Here, after thoroughly considering the mitigating factors and
 the aggravating factor in its opinion imposing sanctions, the
 Hearing Board explained that it was "more than impressed
 with the level and extent of [Raykin's] genuine
 contrition." And rather than imposing the presumptive
 sanction of a suspension, the Board found public censure more
 appropriate, in part because "the mitigating evidence
 here overwhelms the lone factor in aggravation."
 
 17
 
          ¶39
 The Hearing Board's reliance on ABA Standard 7.2 as a
 starting point in determining the appropriate sanction for
 Raykin's violation of Colo. RPC 4.4(a) was appropriate,
 and we affirm the sanctions imposed.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Raykin raised six issues in his
 C.R.C.P. 242.33 Notice of Appeal. Four of the issues relate
 to the merits of the Hearing Board's finding that Raykin
 violated Colo. RPC 4.4(a) and the imposition of sanctions for
 the violation. Of the other two issues raised, one is a
 challenge to the PDJ's denial of Raykin's motion to
 dismiss the complaint. We affirm the PDJ's denial without
 opinion, deferring to the PDJ's discretion to rule on
 such dispositive motions pursuant to C.R.C.P. 242.6(c)(3).
 And, in any event, the matter is moot. The other issue Raykin
 presents challenges the PDJ's denial of the parties'
 Stipulation to Discipline. We likewise affirm without
 opinion, deferring to the PDJ's authority to make such
 decisions. This opinion is therefore focused on the Hearing
 Board's order finding that Raykin violated Colo. RPC
 4.4(a) and the accompanying sanctions.
 
 
 [2] People v. Raines, 510 P.3d
 1089 (Colo. O.P.D.J. 2022); People v. Piccone, 459
 P.3d 136 (Colo. O.P.D.J. 2020); People v. Beecher,
 224 P.3d 442 (Colo. O.P.D.J. 2009).
 
 
 ---------