******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CHIEF DISCIPLINARY COUNSEL
*v.* ZENAS ZELOTES
(AC 35867)

Beach, Alvord and Bear, Js.

*Argued April 22—officially released August 19, 2014*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Hon. Frank H. D'Andrea, Jr., judge
trial referee.)

*Zenas Zelotes*, self-represented, the appellant
(defendant).

*Suzanne B. Sutton*, first assistant chief disciplinary
counsel, with whom was *Karyl L. Carrasquilla*, assis-
tant disciplinary counsel, for the appellee (plaintiff).

*Opinion*

BEAR, J. In this presentment[1] filed by the plaintiff, Chief Disciplinary Counsel, alleging misconduct by the defendant, Attorney Zenas Zelotes, the defendant appeals from the judgment of the trial court concluding that he violated rules 1.7 (a) (2) and 8.4 (4) of the Rules of Professional Conduct (rule), and ordering that he be suspended from the practice of law for a period of five months. On appeal, the defendant claims that (1) the court's findings and the record evidence are inadequate to establish a concurrent conflict under rule 1.7 (a) (2); (2) the court erred in finding that he violated rule 8.4 (4); (3) he was denied due process of law because he did not have fair notice that his conduct could be considered professional misconduct; and (4) the court denied him the benefit of his affirmative defenses. We affirm the judgment of the trial court.

The following facts, which were found by the trial court and which are not contested by the parties, and the court's conclusions in this case, inform our review. "Michael Aliano (Michael) and his wife Terry Aliano (Terry), Connecticut residents, were having some problems in their marriage. On March 19, 2010, they were in New London . . . to try to reconcile and were at a jazz bar together. The defendant was there with his girlfriend, Sharon [Wise], and struck up a conversation with the Alianos. The couples exchanged phone numbers and began seeing one another as couples, in a social capacity. The defendant became friendly with Michael and Terry and socialized together as a threesome. Thereafter, in June, 2010, the defendant started seeing Terry alone, going on walks in the park together, going to movies, for drinks and began 'dating.'

"The defendant had an 'intimate' relationship with Terry. . . . He believed he had an obligation to help her proceed with her divorce, and promote her welfare and make her a happier person. On more than one occasion, their date consisted of sitting close together at the kitchen island in Terry's and Michael's marital home (without the presence of Michael), holding hands, sharing a glass of wine, with candles, music and dimmed lights. . . . Their first kiss came on such an occasion on September 24, 2010. The defendant filed his appearance on behalf of Terry in the Aliano divorce case three days later on September 27, 2010. . . .

"Sometime in December, 2010, Michael came home earlier than expected . . . and the defendant and Terry were again sitting together at the kitchen island with the same ambience and sharing wine. The defendant described Michael's demeanor (not surprisingly) as antagonistic. . . .

"Michael filed a motion in the divorce case to disqualify the defendant from representing Terry in the matter. [The court] *Shluger, J.*, granted the motion on January

24, 2011. After the disqualification, the defendant and Terry ceased their intimate relationship and presumably their 'dating.' . . .

"The plaintiff's presentment complaint contains several alleged violations of the Rules of Professional Conduct. These include [rule] 1.8 (j). This section prohibits sexual relations with a client unless the relationship predates the representation. The defendant denies any sexual relations with Terry at any time during their courtship. The court cannot find, one way or the other, on this issue, but focuses rather on rules 1.7 (a) (2) and rule 8.4 (4). . . .

"The risk that existed under [rule] 1.7 (a) (2) in this case is that their intimacy and the love that the defendant professed for his client might have terminated or its level diminished, bringing into question the future level of competency, diligence and detachment of the defendant. Thus, the court concludes that because of his 'personal interest,' the plaintiff has proven, by clear and convincing evidence, the violation by the defendant of rule 1.7 (a) (2) . . . .

"The Rules of Professional Conduct also state that a lawyer shall not '[e]ngage in conduct that is prejudicial to the administration of justice' . . . Rules of Professional Conduct 8-4 (4). The facts show that the defendant knowingly injected himself into the personal life of Terry Aliano, and into the marital status of her and her husband, Michael Aliano. He became more than her friend, but developed an 'intimate' relationship with her, and they began to 'date.' He encouraged her to go forward with her divorce against Michael . . . and filed an appearance on her behalf in lieu of prior counsel. He believed he was looking out for her welfare and would make her a happier person. The court concludes that attorneys in Connecticut and a reasonable general public would regard the defendant's conduct as appalling, and would thoroughly disapprove. The court shares that view. 'It is professional misconduct for a lawyer to . . . [e]ngage in conduct that is prejudicial to the administration of justice' . . . Rules of Professional Conduct 8.4 (4). Based on the relevant facts that have been set forth, the court rules that the plaintiff has proven, by clear and convincing evidence, a violation of the Rules of Professional Conduct 8.4 (4).

"However, a disciplinary committee need not prove the violation of a specific rule. 'Rather, reference to a specific rule simply assists the trial court in drawing its conclusions as to whether, under the totality of circumstances, professional misconduct occurred.' *Statewide Grievance Committee* v. *Botwick*, 226 Conn. 299, 310, 627 A.2d 901 (1993). Under the totality of the circumstances here, the court concludes that, by clear and convincing evidence, the defendant has committed professional misconduct. . . . The court hereby suspends the defendant from the practice of law for a

period of five months commencing August 1, 2013."[2] (Citations omitted; footnotes omitted.) This appeal followed.

The following well established principles govern the relationship between the Superior Court and members of the bar. "The Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar. . . . The judiciary has the power to admit attorneys to practice and to disbar them . . . to fix the qualifications of those to be admitted . . . and to define what constitutes the practice of law. . . . In the exercise of its disciplinary power, the Superior Court has adopted the Code of Professional Responsibility [now the Rules of Professional Conduct]. . . .

"Disciplinary proceedings are for the purpose of preserving the courts from the official ministration of persons unfit to practice in them. . . . The proceeding to disbar [or suspend] an attorney is neither a civil action nor a criminal proceeding, but is a proceeding sui generis, the object of which is not the punishment of the offender, but the protection of the court. . . . Once the complaint is made, the court controls the situation and procedure, in its discretion, as the interests of justice may seem to it to require. . . . [T]he power of the courts is left unfettered to act as situations, as they may arise, may seem to require, for efficient discipline of misconduct and the purging of the bar from the taint of unfit membership. Such statutes as ours are not restrictive of the inherent powers which reside in courts to inquire into the conduct of their own officers, and to discipline them for misconduct. . . . In [disciplinary] proceedings . . . therefore, the attorney's relations to the tribunal and the character and purpose of the inquiry are such that unless it clearly appears that his rights have in some substantial way been denied him, the action of the court will not be set aside upon review. . . .

"[T]he clearly erroneous standard . . . is the preferable standard of review in attorney grievance appeals. . . . The clearly erroneous standard of review provides that [a] court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citations omitted; internal quotation marks omitted.) *Chief Disciplinary Counsel* v. *Rozbicki*, 150 Conn. App. 472, 478–79, 91 A.3d 932 (2014).

"Additionally, because the applicable standard of proof for determining whether an attorney has violated the Rules of Professional Conduct is clear and convincing evidence . . . we must consider whether the [fact finder's] decision was based on clear and convincing evidence." (Citation omitted.) *Briggs* v. *McWeeny*, 260

Conn. 296, 322–23, 796 A.2d 516 (2002). "[C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Henry* v. *Statewide Grievance Committee*, 111 Conn. App. 12, 21 n.9, 957 A.2d 547 (2008). With these principles in mind, we turn to the defendant's claims on appeal.

I

The defendant claims that the "findings and evidence were inadequate—as a matter of law—to sustain a finding of a 'concurrent conflict' under rule 1.7 (a) (2)." He asserts that, because he challenges only the propriety of the court's conclusion and not any of the court's factual findings, the appropriate standard of review for this claim is plenary. The plaintiff argues that "the trial court's finding of a rule 1.7 (a) violation was not clearly erroneous, was based on sound legal grounds and was supported by the evidence." On the basis of the undisputed facts, we agree with the plaintiff.

As stated previously, the preferred standard of review in attorney grievance appeals is the clearly erroneous standard. *Chief Disciplinary Counsel* v. *Rozbicki*, supra, 150 Conn. App. 479. Accordingly, we will examine the record to ascertain if it contains evidence to support the court's determination that the defendant was in violation of rule 1.7 (a). See id. Additionally, we will consider whether the court's decision was based on clear and convincing evidence. See *Briggs* v. *McWeeny*, supra, 260 Conn. 322–23.

Rule 1.7 of the Rules of Professional Conduct provides: "(a) Except as provided in subsection (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

"(b) Notwithstanding the existence of a concurrent conflict of interest under subsection (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by

one client against another client represented by the lawyer in the same litigation or the same proceeding before any tribunal; and (4) each affected client gives informed consent, confirmed in writing."

The court found, inter alia, that the defendant specifically violated rule 1.7 (a) (2), which, in this case, required the court to have found by clear and convincing evidence that there was a significant risk that the defendant's representation of Terry Aliano would be materially limited by his personal interest. The defendant argues that the court's finding of a concurrent conflict "rested on nothing more than mere speculation that a chain of events whose occurrence theoretically could one day lead counsel to act counter to his client's interests might in fact occur." He contends that our review of the record will necessitate a conclusion that the evidence does not support the court's conclusion of a violation of rule 1.7 (a). We are not persuaded.

The uncontested findings of the trial court along with the defendant's own trial testimony reveal the following. When the defendant met Terry Aliano in March, 2010, Terry and her husband were attempting to reconcile after having filed for dissolution of their marriage. The defendant and his girlfriend[3] became friendly with the Alianos and began to socialize with them through July or August, 2010, including with the Alianos' children. Despite the defendant's having a girlfriend, with whom he had a sexual relationship and with whom he appears to have remained involved, and despite knowing that the Alianos were attempting to reconcile their marriage and keep their family together, he decided, in June, 2010, while he and his girlfriend were still socializing with the Alianos, that he wanted to get close to Terry "to gain her confidence . . . ."

The defendant testified that he had "resolved to date Terry Aliano in an effort to say, sweetheart, this is what the other sides look like, to get her excited about life, to get her remembering what it was like to do the things that she loved to do that she couldn't do in the relationship because I believe that if I gave her the emotional strength, if she remember[ed] what it was like to be in a healthy relationship and happy, then she would have the conviction and the courage that she needed to move forward in the divorce." He stated that he wanted to be Terry's protector, and that he had a "moral obligation" to give her "the strength and the encouragement to move forward with [her divorce attorney]."[4]

The defendant testified that in June, 2010, he began advising Terry about her divorce, both as a friend and as an attorney. When questioned by the court, however, he asserted that his conversations with Terry were privileged because he is an attorney. The defendant also testified that he started spending time alone with Terry in June, 2010, and they began dating, going on walks in a park together, going to movies, and going out for

drinks. He also gave her legal advice about her divorce, "educating her about her rights, about remedies," despite his knowledge that she had an attorney, whom the defendant held "in high regard" and with whose representation he did not want to interfere. The defendant testified that he had an intimate relationship with Terry but that they did not engage in sexual intercourse. They held hands, hugged, shared wine,[5] lit candles, listened to music, and dimmed the lights. Their first kiss occurred on September 24, 2010, three days before the defendant filed his official appearance on behalf of Terry in the Aliano dissolution case.[6]

The defendant testified that he had a retainer agreement with Terry that called for his standard charging rate of either $200 or $250 per hour, and that Terry had paid him a retainer of $10,000—$9000 of which went to his fees, and $1000 of which was applied to other fees and costs. He also stated that he had put his bankruptcy practice on hold so that he could devote his full attention to the Aliano case. He further stated that the cost of his services had amounted to approximately $20,000, but, because the trial court did not award attorney's fees to Terry, he ultimately released her from the balance that she owed. Additionally, the defendant testified that he had worked out a quid pro quo with Terry where she would work for his law office in exchange for some of the money she owed him. He also testified that Terry had complained about the paralegal costs of her former attorney, so the defendant told her that he would "take [her] under [his] wing." He told her that she could perform some of the paralegal functions for him and reduce her costs by "play[ing] an active role" in the case. The defendant told Terry: "But if you are with me, then not only are you going to be shielded from that potential cost, but you are going to also be able to put the time and labor and love into making sure that this case is properly presented. So, it's going to mitigate your financial risk." The day after this conversation, Terry asked the defendant to file an appearance on her behalf. The defendant did not pay Terry for her paralegal services, and he did not recall if the quid pro quo was written into his retainer agreement.

Additionally, during the defendant's representation of Terry, he sometimes visited the marital residence where both Terry and Michael continued to reside. On one of those visits in particular, Michael returned to the home at approximately 11:20 p.m. and witnessed his wife and the defendant sharing a glass of wine by candlelight. When Michael tried to engage in conversation with the defendant, the defendant told him that "the Rules of Professional Conduct prohibit[ed] [him] from engaging [Michael] in conversation" and that Michael needed to communicate only through his own attorney. Although the defendant testified before the trial court that he was visiting Terry only as a social

guest, he also stated that when Michael was present, he quoted the Rules of Professional Conduct to Michael, took out legal books, and he showed Terry how to mark exhibits, create a trial notebook, and create a table of contents. He also testified that, although he was at the Alianos' marital home purely as a social guest, there were times when his communication with Terry while in the home was privileged because, in his words: "If it's a communication to counsel for the purpose of obtaining advice in connection with a legal matter, then that would be privileged. Now, if, in the next sentence, we are talking about the Super Bowl, then that would not be privileged . . . ."

On the basis of this evidence and the court's findings, the court found, by clear and convincing evidence, that the defendant had violated rule 1.7 (a) (2). We conclude that the record fully supports the court's decision.

In *People* v. *Beecher*, 224 P.3d 442, 444 (Colo. O.P.D.J. 2009), the respondent attorney was found, in part, to have violated rule 1.7 (b), which mimics our rule 1.7 (a) (2), by his intimate, nonsexual relationship with his client during her dissolution of marriage case. The court found that the attorney's relationship with the client was so close that it compromised the attorney's responsibilities to his client. Id., 450. Specifically, the court found that the attorney had lived, worked, and traveled with the client, who was emotionally strained because of her divorce, and that he "saw himself as [the client's] personal protector, as opposed to her counsel in her divorce . . . . In this role he lost all objectivity and the independent judgment needed to help [the client] navigate through an emotionally trying divorce." Id. Additionally, although the attorney believed that no conflict existed, the court found that "his belief was unreasonable . . . [and that the client's] ability to make an informed decision on this issue had been severely compromised." Id., 450–51. Similarly in the present case, the defendant saw himself as Terry's protector. He then intentionally interjected himself into the middle of her dissolution, giving her legal advice, despite knowing that she was represented by counsel, telling her to proceed with the dissolution instead of attempting to reconcile with her husband, and intentionally seeking to date her and gain her confidence.

In *Musick* v. *Musick*, 192 W. Va. 527, 453 S.E.2d 361 (1994), the court discussed "Formal Opinion Number 92-364 of the American Bar Association (ABA) Standing Committee on Ethics and Professional Responsibility (the committee). . . . [The committee found that] there are several provisions of the Model Rules that may be implicated by a sexual relationship, particularly one that arises after the formation of the attorney-client relationship. First, because of the dependence that so often characterizes the attorney-client relationship, there is a significant possibility that the sexual relation-

ship will have resulted from exploitation of the lawyer's dominant position and influence and, thus, breached the lawyer's fiduciary obligations to the client. Second, a sexual relationship with a client may affect the independence of the lawyer's judgment. Third, the lawyer's engaging in a sexual relationship with a client may create a prohibited conflict between the interests of the lawyer and those of the client. Fourth, a non-professional, yet emotionally charged, relationship between attorney and client may result in confidences being imparted in circumstances where the attorney-client privilege is not available, yet would have been, absent the personal relationship." (Citation omitted; internal quotation marks omitted.) Id., 530–31.

The court then explained: "As noted in the ABA opinion, if the lawyer's interests in the relationship with the client interfere with decisions that must be made in the client's behalf, the lawyer's representation of that client will have been impaired and perhaps materially limited. The ABA committee further opined that a sexual relationship between an attorney and client may confuse the line to be drawn in protecting client confidences. This is caused by the fact that only those confidences imparted in the context of the attorney-client relationship are protected by privilege. Confidences imparted in a personal relationship, except for husband and wife, are not protected.

"The ABA committee also observed that the attorney-client relationship is a fiduciary one and that a lawyer's fiduciary obligation is heightened if the client is emotionally vulnerable to the extent that the client's ability to make reasoned judgements about the future is affected. This could be of particular concern in a divorce proceeding where emotions run high and the proceedings may present the equivalent of a life crisis for the client. The nature of the representation may also affect the degree of dependence the client feels toward the attorney. Obviously, in a divorce or other advers[e] domestic relations proceeding, the issues are more emotionally charged. Thus, as the committee observed, the more vulnerable the client, the more imperative it becomes for the lawyer to maintain a normal attorney-client relationship." Id., 531.

Although in the present case, the defendant testified that his relationship with Terry was nonsexual, and the court determined that it had no evidence to reach a contrary determination, the intimate and romantic nature of the defendant's relationship with Terry is not contested. Moreover, although the defendant contends that this intimate relationship predated his filing of an appearance in the Alianos' divorce proceeding, it is uncontested that he gave Terry legal advice about her divorce beginning in June, 2010, despite the fact that she already was represented by counsel, and despite the fact that the defendant and his girlfriend socialized

with the Alianos and their children. Additionally, it is uncontested that the defendant set out to date Terry and to gain her confidence in June, 2010, in an effort to give her the "conviction and the courage that she needed to move forward in the divorce," apparently at the same time he was giving her legal advice, although he was not her attorney at that time, and socializing with her husband and children.

The defendant proudly admits that he did not maintain a normal attorney-client relationship with Terry, and that, because of their intimate relationship, he was willing to "go the extra mile." See generally *In the Matter of Tsoutsouris*, 748 N.E.2d 856, 860 (Ind. 2001) ("[i]n their professional capacity, lawyers are expected to provide emotionally detached, objective analysis of legal problems and issues for clients who may be embroiled in sensitive or difficult matters" [internal quotation marks omitted]). He injected himself into the middle of the Alianos' marriage issues and dissolution proceedings, and he antagonized Michael Aliano. See *Chestone* v. *Chestone*, 322 N.J. Super. 250, 259, 730 A.2d 890 (App. Div. 1999) ("We recognize that the nature of family litigation sometimes causes the litigants to become emotionally involved. Unfortunately, on occasion, the emotional involvement leads to acrimony. When those two factors are present the parties, on occasion, permit their emotions and acrimony to predominate over reason. The attorney, on the other hand, must be detached from emotion and acrimony."). The defendant drank wine with Terry while the children were home despite an agreement that Terry had made with the Department of Children and Families prohibiting anyone who was under the influence of alcohol from caring for the children, a copy of which was hung on her refrigerator. The defendant also put his bankruptcy practice on hold so that he fully could concentrate on this one case.

He also testified that, when he was discussing with Terry the possibility of representing her, he worked out a quid pro quo with her to help offset her legal expenses and agreed to write off the balance of his fees if the court did not award those fees in the dissolution action. The defendant told Terry that if she were represented by him, that he would take her under his wing, that she would be shielded from the higher costs of her other attorney, and that she would mitigate her financial risk. Despite all of this, the defendant declares that "the court correctly observe[d]—that at no time—has [the defendant] expressed remorse" and that he "remains resolute."[7]

On the basis of these uncontested factual findings of the trial court and the defendant's own trial testimony, we conclude that the court's finding that the defendant violated rule 1.7 (a) (2) by having a concurrent conflict that created a significant risk that his representation

of Terry would be materially limited by his personal interest is fully supported by clear and convincing evidence, and is not clearly erroneous.[8]

## II

The defendant also claims that the court erred in finding that he violated rule 8.4 (4) because: (1) his conduct purely was personal and beyond the scope of rule 8.4 (4); (2) there are no clear and meaningful standards for the imposition of discipline under rule 8.4 (4); and (3) the court's finding of a rule 8.4 (4) violation "tramples upon core constitutional rights to pursue and maintain intimate associations." We will consider each of these in turn.

### A

The defendant claims that the court erred in finding that he violated rule 8.4 (4) because his conduct purely was personal and beyond the scope of rule 8.4 (4). He argues that our "Supreme Court has not yet articulated the test to be used to determine if conduct—which does not violate any other disciplinary rule—is *independently* punishable as *prejudicial* to the *administration* of justice—it is a *matter of first impression*." (Emphasis in original.) Because we have concluded in part I of this opinion that the court's finding that the defendant violated rule 1.7 (a) (2) was supported by clear and convincing evidence and was not clearly erroneous, the defendant's argument that there cannot be an independent violation of rule 8.4 (4) is moot.

### B

The defendant next claims that we must determine "whether the judge imposed discipline in the absence [of] clear and meaningful standards. As concerns [rule] 8.4 (4)—clear and meaningful standards are a *constitutional requirement*." (Emphasis in original.) He also argues that the trial court's "*subjective declaration* that . . . 'under the *totality of the circumstances*, professional misconduct occurred' does not satisfy the requirement that an independent [rule] 8.4 (4) violation rest on *clear and meaningful standards*." (Emphasis in original.) The defendant alleges that the lack of standards is a due process violation.

It is unclear to us exactly what the defendant is claiming. He appears to argue that rule 8.4 (4) does not contain clear and meaningful standards of application, that an independent violation of rule 8.4 (4) cannot occur in the absence of clear and meaningful standards, and that the court thus erroneously found that he violated rule 8.4 (4) and imposed discipline in the absence of clear and meaningful standards. The plaintiff responds by stating that rule 8.4 is constitutional and by demonstrating that the defendant had adequate notice and an opportunity to be heard. In his reply brief, the defendant responds that the plaintiff did not address his claim properly. He states that he readily acknowl-

edges that rule 8.4 is constitutional but asserts that he is making an "as-applied challenge" to the rule. He then argues that "(1) *no clear and meaningful standards exist*; that (2) [he] *lacked fair notice* of the (nonexistent) standards; and that (3) these (nonexistent) standards fail to comport with the requirements of *strict judicial scrutiny*." (Emphasis in original.)

We readily understand if the plaintiff was confused by the defendant's claim and his arguments. After careful consideration, and on the basis of the arguments set forth in the defendant's brief and his reply brief, we conclude that the only reasonable interpretation of the defendant's arguments is that he is claiming that rule 8.4 is unconstitutional because there are no clear and meaningful standards established for its application, which appears to be a vagueness argument rather than an as-applied challenge.

As generally stated, "[t]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . [The doctrine] embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . The United States Supreme Court has emphasized that the more important aspect of the vagueness doctrine is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . and must not impermissibly [delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Finally, [i]f the meaning of a statute can be fairly ascertained a statute will not be void for vagueness . . . for [i]n most English words and phrases there lurk uncertainties. . . . [T]he statute must contain some core meaning within which the defendant's actions clearly fall. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Citations omitted; internal quotation marks omitted.) *State* v. *McMahon*, 257 Conn. 544, 551–53, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002).

Despite what the defendant argues in his reply brief, he has not briefed an "as-applied" challenge to rule 8.4. The defendant appears to set forth a claim that rule 8.4 is unconstitutionally vague, and he "*expressly acknowledges* [that rule] 8.4 is constitutional." (Emphasis in

original.)

As the United States Court of Appeals for the Fifth Circuit explained in *Howell* v. *State Bar of Texas*, 843 F.2d 205, 208 (5th Cir.), cert. denied, 488 U.S. 982, 109 S. Ct. 531, 102 L. Ed. 2d 563 (1988), the rules of practice "appl[y] only to lawyers, who are professionals and have the benefit of guidance provided by case law, court rules and the 'lore of the profession.' " In explaining a rule identical to our rule 8.4 (4), the court in *Howell* stated: "DR 1-102 (A) (5) provides in pertinent part that a lawyer shall not '[e]ngage in conduct that is prejudicial to the administration of justice.' This provision is not peculiar to the State of Texas. It was part of the American Bar Association's Code of Professional Responsibility promulgated in 1969 and subsequently adopted by almost every State in the Union. There was nothing startlingly innovative in DR 1-102 (A) (5)'s contents. Since the early days of English common law, it has been widely recognized that courts possess the inherent power to regulate the conduct of attorneys who practice before them and to discipline or disbar such of those attorneys as are guilty of unprofessional conduct." Id., 206; see also *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 553–54, 663 A.2d 317 (1995) ("Superior Court possesses inherent authority to regulate attorney conduct and to discipline the member of the bar" [internal quotation marks omitted]).

We conclude that although the plain text of rule 8.4 (4) may lack detail and precision; see 2 G. Hazard & W. Hodes, The Law of Lawyering (3d Ed. Supp. 2009) § 65.6, pp. 65-15 and 65-16; its meaning is clear from the rules, the official comments to the rules, and case law interpreting rule 8.4 (4) or rules that substantively are identical to our rule 8.4 (4). Attorneys are sufficiently on notice of what behavior is proscribed and what conduct is required of them. See id.; *Howell* v. *State Bar of Texas*, supra, 843 F.2d 208 (rule prohibiting conduct prejudicial to administration of justice is neither vague nor overbroad because case law and "lore of the profession" provide sufficient guidance to attorneys).[9]

C

The defendant also claims that the court erred in finding that he violated rule 8.4 (4) because the court's finding of a rule 8.4 (4) violation "tramples upon core constitutional rights to pursue and maintain intimate associations." He argues that the court "punish[ed] the time, place and manner of [his] and Terry's dating practices—impermissibly trampl[ing] upon their respective rights to maintain and pursue an intimate association." (Emphasis omitted.) We disagree.

"[A] comprehensive disciplinary scheme has been established to safeguard the administration of justice, and designed to preserve public confidence in the sys-

tem and to protect the public and the court from unfit practitioners. . . . General Statutes § 51-90g and the parallel rules of practice authorize the grievance committee to act as an arm of the court in fulfilling this responsibility. . . . These rules exist within the broader framework of the relationship between attorneys and the judiciary. . . . This unique position as officers and commissioners of the court . . . casts attorneys in a special relationship with the judiciary and subjects them to its discipline. . . .

"An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited. . . . Therefore, [i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." (Citations omitted; internal quotation marks omitted.) *Massameno* v. *Statewide Grievance Committee*, supra, 234 Conn. 554–55.

In this case, we do not agree with the defendant's contention that the court disciplined him under rule 8.4 (4) for "the time, place and manner of [his] and Terry's dating practices . . . ." (Emphasis omitted.) As the facts set forth fully in part I of this opinion establish, and which need not be restated, the defendant's behavior in this case created a significant risk that his representation of Terry would be materially affected by his personal interest. It is the timing and totality of this behavior, not the time, place and manner of his dating, that is prejudicial to the administration of justice.

### III

The defendant next argues that he was denied due process of law because he did not have fair notice that his conduct could be considered professional misconduct under the rules. He contends that even if his other claims fail and the court properly determined that his conduct was within the scope of the rules, that alone "would not . . . form a sufficient basis to impose discipline." He purports: "Not once has a Connecticut lawyer—ever—been disciplined under rule 8.4 (4) on account of the time, place and manner he or she maintained a pre-existing nonsexual relationship. Not once has a Connecticut court held that the mere existence

of an intimate relationship is—alone—sufficient to establish a concurrent conflict. Not once. The resulting suspension is unconscionable. There is no fair notice." (Emphasis omitted.)

The problem with the defendant's argument, as explained throughout this opinion, is that the court did not suspend him for "the mere existence of an intimate relationship . . . ." (Emphasis omitted.) The defendant clearly fails to recognize the seriousness and the disturbing nature of his continuing conduct, and he now contends that the *court's* action in suspending him was "unconscionable."

First, we reiterate that the court reasonably could have concluded that the defendant's conduct violated both rule 1.7 (a) (2) and rule 8.4 (4). We also reiterate that the rule prohibiting conduct that is prejudicial to the administration of justice is neither vague nor overbroad because case law and "lore of the profession" provide sufficient guidance to attorneys in determining proper conduct. *Howell* v. *State Bar of Texas*, supra, 843 F.2d 208. The defendant also offered no argument that rule 1.7 was vague or overbroad.

To the extent that the defendant's arguments relate to the specific sanction imposed by the court, as our Supreme Court previously has noted, "it is not the function of this court to determine the sanction we would have imposed on the [defendant had we been] faced with that task. . . . In matters of attorney misconduct, [the trial] court is free to determine in each case, as may seem best in light of the entire record before it, whether a sanction is appropriate and, if so, what the sanction should be. . . . As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably concluded as it did." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Briggs* v. *McWeeny*, supra, 260 Conn. 335–36.

"The trial court has inherent judicial power, derived from judicial responsibility for the administration of justice, to exercise sound discretion to determine what sanction to impose in light of the entire record before it. . . .

"The American Bar Association has promulgated standards for the imposition of sanctions. . . . [A]fter a finding of misconduct, a court should consider: (1) the nature of the duty violated; (2) the attorney's mental state; (3) the potential or actual injury stemming from the attorney's misconduct; and (4) the existence of aggravating or mitigation factors. . . .

"The aggravating factors referenced in the standards include (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary

proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; [and] (j) indifference to making restitution. . . . The mitigation factors include: (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical or mental disability or impairment; (i) delay in disciplinary proceedings; (j) interim rehabilitation; (k) imposition of other penalties or sanctions; (l) remorse; [and] (m) remoteness of prior offenses." (Citations omitted; internal quotation marks omitted.) *Chief Disciplinary Counsel* v. *Rozbicki*, supra, 150 Conn. App. 487–88.

In the present case, the court's memorandum of decision reveals that it carefully considered the appropriate standards for imposing discipline. The court considered the defendant's prior disciplinary sanction, which occurred in 2005, the defendant's continued lack of remorse, and his "failure to perceive the risks involved in his activities . . . ." The court also carefully examined mitigating factors, including the defendant's "misplaced belief that his actions were of a benevolent nature and enured to the benefit of Terry Aliano." On the basis of the serious nature of the defendant's misconduct, we conclude that the trial court reasonably could have concluded that the defendant was unfit to practice law and, consequently, that a suspension was warranted. See *Statewide Grievance Committee* v. *Shluger*, 230 Conn. 668, 680, 646 A.2d 781 (1994). We are not persuaded that the trial court acted unreasonably or that the "resulting suspension is unconscionable." (Emphasis omitted.) Accordingly, we conclude that the trial court acted within its discretion in suspending the defendant from the practice of law for a period of five months.

IV

The defendant's final claim is that the court denied him due process by "fail[ing] to adjudicate core issues essential to this action . . . ." He asserts that the court failed to consider and adjudicate the meritorious good faith affirmative defenses that he raised. The defendant argues that, because he had a good faith belief that his conduct was outside of the scope of the rules and that he was exercising his core constitutional rights, his conduct was not actionable. He also argues that the court improperly declined to apply the rule of lenity and that he was entitled to such application because

of ambiguity in the rules. The defendant contends that he "was afforded an opportunity to be heard—but not a meaningful opportunity satisfying the requirements of due process. As concerns these questions of law—[he] was afforded a trial—in name only." (Internal quotation marks omitted.) The plaintiff argues that the trial court considered all of the defendant's defenses, which were raised in motions, briefs and at oral argument. It also argues that the rule of lenity does not apply here because there is no ambiguity in the rules that the defendant violated. We agree with the plaintiff.

The defendant does not argue that he was barred from presenting a defense; he argues that the court did not consider the defenses he raised and that it failed to apply the rule of lenity. Essentially, the defendant argues that, because he believed he was acting outside the scope of the rules, and no attorney previously had been disciplined merely for engaging in an intimate relationship with a person who was not a client at the time the intimacy began, he either could not be disciplined or the rule of lenity should have been applied because he could not have known that the conduct was improper under the rules.[10]

Again, the problem with the defendant's argument is that he fails to see the serious nature of his conduct. He was not disciplined for a mere intimate relationship with a nonclient. First, although the defendant contends that his intimate relationship with Terry predated his filing of an appearance in her dissolution case, it is uncontested that he gave Terry legal advice about dissolution issues beginning in June, 2010. At that time, Terry already was represented by counsel and that fact was known by the defendant. The defendant and his girlfriend, Wise, also socialized with the Alianos and their children, while, at the same time, the defendant intentionally schemed to date Terry and to gain her confidence beginning in June, 2010. He admittedly did this in an effort to persuade and encourage Terry to proceed with her pending dissolution case, despite knowing that she was represented by counsel and was attempting to reconcile her marriage and her family. The defendant also proudly admits that he did not maintain a normal attorney-client relationship with Terry, but that because of their intimate relationship he was willing to "go the extra mile." The defendant injected himself into the middle of the Alianos' marriage, and antagonized Michael Aliano. The defendant shared wine with Terry while the children were home despite an agreement that Terry had made with the Department of Children and Families prohibiting anyone who was under the influence of alcohol from caring for the children; a copy of this agreement was hung prominently on Terry's refrigerator, and, although the defendant was not subject to this agreement, his client, Terry, was a party to it. The defendant also put his bankruptcy practice on hold so that he fully could concentrate on this one case,

and he worked out a quid pro quo with Terry to help offset her legal expenses. He additionally agreed to write off the balance of his fees if the court did not award those fees in the dissolution action. The defendant told Terry that if she were represented by him, that he would take her under his wing, that she would be shielded from the higher costs of her other attorney, and that she would mitigate her financial risk.

These are the facts that led the court to not accept the defendant's "good faith affirmative defense[s]," although it certainly did recognize that the defendant mistakenly thought his actions were noble.[11] This case presents much more than a mere intimate relationship starting before Terry was an "official" client. The defendant's belief that his actions were proper and that he had no way of knowing that he could be subject to discipline may be an attempt to explain away or to justify his actions, but, as the court found by clear and convincing evidence, his misguided belief is not a valid or acceptable defense to rules 1.7 (a) (2) and 8.4 (4).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See Practice Book § 2-47.

[2] General Statutes § 51-84 provides: "(a) Attorneys admitted by the Superior Court shall be attorneys of all courts and shall be subject to the rules and orders of the courts before which they act.

"(b) Any such court may fine an attorney for transgressing its rules and orders an amount not exceeding one hundred dollars for any offense, and may suspend or displace an attorney for just cause."

[3] The defendant also had represented this girlfriend in her marital dissolution proceedings. He testified that their relationship, which was sexual, began well before his representation of her, however.

[4] The defendant testified that he felt this way because of something Wise had told him about Michael Aliano, the details of which are not important to this opinion, as the defendant did not offer the details for their truth. The defendant also testified that "the duty—the lawyer's obligation is to look out for the client's comprehensive quality of life, that a lawyer, in addition to the considerations of the case, can factor in other considerations, such as economic, religious, sociological . . . what have you.

"Now, ultimately, [Terry's] quality of life benefited from the promotion, the assistance, and the maintenance of an intimate relationship. It was a positive in her life, positive in my life."

He also admitted that he had told the grievance committee that he would advise a woman going through a divorce to "find a competent trial lawyer and make him your boyfriend," and that if you "aggravate a client, maybe you lose their business [but if] you aggravate a sweetheart, you are sleeping on the couch . . . ." Further, the defendant testified that he "believe[d] that a litigant benefits from dating a talented trial lawyer . . . ."

Additionally, the defendant testified that "a lawyer's love and affection for his client is a motivating factor to give—to go the extra mile. You know, now, it doesn't mean that if the intimate relationship ends that the lawyer is somehow precluded from providing exceptional representation or making the extra effort, but certainly if you care about your client, if you genuinely care about the cause that you are litigating, you are going to go the extra mile. But this—there is no requirement that you go the extra mile. It's just something that you do selfishly because you care." The court then asked the defendant what he meant by going "an extra mile . . . ." The defendant explained that he might "writ[e] a more extensive brief in support of the client's cause." The court next asked the defendant if he represented different clients differently, to which the defendant responded, "I think that could be argued. I think that's a fair statement . . . ."

[5] The defendant and Terry shared wine in the Aliano home while the children were present in the home despite an agreement that each of the

Alianos had with the Department of Children and Families stating that each party "agreed not to allow anyone [who] . . . is under the influence of alcohol or drugs to care for the children." A copy of this agreement hung prominently on the refrigerator door in the Aliano home.

The defendant argues that the agreement is irrelevant because he "was not caring for the children—their mother—Terry Aliano was. A court cannot discipline [the defendant]—because the mother—Terry Aliano drank a glass of wine." The plaintiff responds that the document illustrated "that [the defendant], while representing Mrs. Aliano, engaged in conduct which caused her to violate a [Department of Children and Families'] agreement. It was not used to infer some sort of agreement on his part personally to refrain from drinking. [The defendant's] misunderstanding of the evidence is indicative of how his personal interest clouded his professional judgment."

[6] The defendant testified that Terry approached him and said that her attorney needed another $30,000, but that she did not have the money. The defendant then told Terry that he was "available for [her]" if she needed him, and that, although he was not a family law practitioner, he had "an exceptional command of the facts of [the] case by virtue of the time that [they had] spent daily talking about [the] case, day after day after day, [and that he had] a command of [the] case that no other attorney could reasonably expect to acquire because of [their] relationship . . . ." The defendant also told Terry: "[L]ook, I genuinely care for you. This is not—if you ask me to represent you, this is not just an ordinary case. You are not going to get an average attorney or some average attorney who just treats it like any other [case]."

[7] During his defense testimony at trial, the defendant testified on the issue of remorse as follows: "The last thing that I would say, Your Honor, is sister counsel has talked about a lack of remorse, and she's right. I am about as remorseful as Rosa Parks on the [front] of the bus. Now, I'm sure some folks might've said, hey, Rosa, why are you upsetting the white folks? Wouldn't it have been easier for you to just get up and go to the back of the bus? I suppose she could've. But, well, you know how that story played out. And I suppose the same could be said of me. Hey, Mr. Zelotes, wouldn't it have been easier if the angry white man walked in the door, that you just got up, went to the back of the bus. What sister counsel calls a lack of remorse, I call principle and adherence to integrity."

[8] The defendant also complains that the trial court failed to discuss rule 1.7 (b) in its decision. He argues that even if he violated rule 1.7 (a) (2) by having a concurrent conflict, the evidence clearly demonstrates that Terry waived the conflict and consented to his representation, and that his only failure was that he did not get her informed consent in writing, which, he argues, merely is a violation of rule 1.7 (b) (4). We do not agree.

Pursuant to the relevant portion of rule 1.7 (b), even if there is a concurrent conflict, a lawyer may represent a client only if "(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client . . . and (4) each affected client gives informed consent, confirmed in writing." Accordingly, the lawyer's belief must be reasonable, and the lawyer must obtain written informed consent from the client. See 1 G. Hazard & W. Hodes, The Law of Lawyering (3d Ed. Supp. 2004) § 11-8, p. 11-22 (rule 1.7 [a] [2] "contemplates a case-by-case weighing of the facts and permits representation only where there is both fully counseled client consent *and* a reasonable belief on the part of the lawyer that the conflict is not insurmountable, as required by rule 1.7 [b]" [emphasis in original]).

In the present case, it is undisputed that the defendant failed to obtain his client's written informed consent. Therefore, we conclude that rule 1.7 (b) does not apply to this case. Because rule 1.7 (b) does not apply without the informed written consent of the defendant's client, we need not discuss or opine on the reasonableness of the defendant's belief that he could provide competent and diligent representation to his client under the circumstances of this case or whether the client's purported consent in this case was informed.

[9] In *Henry* v. *Statewide Grievance Committee*, supra, 111 Conn. App. 12, we noted the broad reach of rule 8.4 (4): "We begin by noting that rule 8.4 (4) casts a wide net over an assortment of attorney misconduct. *O'Brien* v. *Superior Court*, 105 Conn. App. 774, 805, 939 A.2d 1223 (*DiPentima, J.*, concurring in part and dissenting in part), cert. denied, 287 Conn. 901, 947 A.2d 342 (2008)." (Internal quotation marks omitted.) *Henry* v. *Statewide Grievance Committee*, supra, 24. In footnote 11 of that opinion, we also noted that "Connecticut courts, although only occasionally considering the

matter, have upheld findings of rule 8.4 (4) violations where an attorney wrote a letter accusing a judge of extorting money from his client; *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 236, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006); where an attorney refused to attend several criminal pretrial conferences; *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 830, 633 A.2d 296 (1993); and where an attorney failed to pay a judgment that had been rendered against him in a timely manner. *Daniels* v. *Statewide Grievance Committee*, 72 Conn. App. 203, 210, 804 A.2d 1027 (2002)." *Henry* v. *Statewide Grievance Committee*, supra, 24 n.11.

We further noted that "[o]ur sister states have found 8.4 (4) violations under even further reaching circumstances. See, e.g., *In re Selmer*, 749 N.W.2d 30, 36 (Minn. 2008) (failure to file income tax); *State ex rel. Oklahoma Bar Assn.* v. *Whitworth*, 183 P.3d 984, 991 (Okla. 2008) (failure to appear in court on behalf of client); *North Carolina State Bar* v. *Ethridge*, [188 N.C. App. 653, 664–65, 657 S.E.2d 378 (2008)] (preparation and recordation of deed conveying client's property to self contrary to client's intent); *In re Abbott*, 925 A.2d 482, 486–87 (Del.) (submission of brief including inflammatory language), cert. denied sub nom. *Abbott* v. *Office of Disciplinary Counsel*, 552 U.S. 950, 128 S. Ct. 381, 169 L. Ed. 2d 263 (2007); *Attorney Grievance Commission* v. *Mba-Jonas*, 397 Md. 690, 701, 919 A.2d 669 (2007) (careless management of escrow account); *Florida Bar* v. *Barcus*, 697 So. 2d 71, 72–74 (Fla. 1997) (appeal filed solely for purpose of delaying foreclosure); *Attorney Grievance Commission* v. *Garland*, 345 Md. 383, 390, 396–97, 692 A.2d 465 (1997) (failure to appear at alcohol treatment facility in violation of court order); *Attorney Grievance Commission* v. *Singleton*, 315 Md. 1, 6, 553 A.2d 222 (1989) (failure to notify client of own suspension from legal practice)." *Henry* v. *Statewide Grievance Committee*, supra, 111 Conn. App. 24 n.11.

[10] In *Daniels* v. *Statewide Grievance Committee*, 72 Conn. App. 203, 210–11, 804 A.2d 1027 (2002), we explained that a violation of rule 8.4 (4) does not require scienter or knowledge that the conduct is a violation of the rule: "We also reject the plaintiff's argument that the failure to pay a judgment promptly does not constitute a violation of rule 8.4 (4) and that intent is a prerequisite finding to a violation of that rule. Regarding that point, the [trial] court correctly stated: 'Judges no less than lawyers are chargeable for deviations from the codes governing their conduct, even though the application of the canons to particular circumstances may not be readily apparent. [*Patterson* v. *Council on Probate Judicial Conduct*, 215 Conn. 553, 567, 577 A.2d 701 (1990)]; *Grievance Committee* v. *Rottner*, 152 Conn. 59, 65–66, 203 A.2d 82 (1964). A judge may be sanctioned for a wilful violation of one of the canons of judicial conduct if he intended to engage in the conduct for which he is sanctioned whether or not [he] knows that he violates the rule. *In re Flanagan*, 240 Conn. 157, 183, 690 A.2d 865, cert. denied, 522 U.S. 865, 118 S. Ct. 172, 139 L. Ed. 2d 114 (1997).' . . . That reasoning equally is applicable to lawyers and, therefore, we conclude that the [trial] court properly held that rule 8.4 (4) does not have a scienter requirement."

[11] When examining the mitigating factors, the court considered the defendant's "misplaced belief that his actions were of a benevolent nature and enured to the benefit of Terry Aliano."